```
1              IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF SOUTH CAROLINA
2                        AIKEN DIVISION

3
       United States of America, )
4                                )
                    Plaintiff,   )
5                                )
                   -versus-      )    1:24-CR-00412
6                                )    March 3, 2025
       Thomas Bateman, Jr.       )    Columbia, SC
7                                )
                    Defendant.   )
8      _____)

9


10        BEFORE THE HONORABLE JOSEPH F. ANDERSON, JR.
             UNITED STATES DISTRICT JUDGE, PRESIDING
11                     Sentencing Hearing

12
       A P P E A R A N C E S:
13

14     For the Government:      Scott Matthews, AUSA
                                United States Attorney's Office
15                              1441 Main Street, Suite 500
                                Columbia, SC  29201
16
       For the Defendant:       Marion Moses, Esq.
17                              Marion Moses Law Offices
                                PO Box 5615
18                              Columbia, SC  29250

19     Court Reporter:          Kathleen Richardson, RMR, CRR
                                United States Court Reporter
20                              901 Richland Street
                                Columbia, SC 29201
21

22             STENOTYPE/COMPUTER-AIDED TRANSCRIPTION

23                     *** *** *** ***

24

25
```

1          Monday, March 3, 2025.

2              THE COURT:  Good afternoon.  Mr. Matthews, please

3     call the first case this afternoon.

4              MR. MATTHEWS:  Thank you, Your Honor.  May it

5     please the Court.  The next matter is the United States of

6     America versus Thomas Allen Bateman, Junior.  That's Criminal

7     Case Number 1:24-412.

8          Your Honor, Mr. Bateman pled guilty to Count One of a

9     superseding indictment alleging conspiracy to commit bank

10    fraud on August 13th, 2024.  United States Probation Office

11    has written a presentence report.

12         There were objections filed to that presentence report.

13    However, as of February 26th of 2025, Mr. Marion Moses, who

14    is here in the courtroom representing Mr. Bateman, has

15    withdrawn all his objections as of today's date.  Your Honor,

16    there are no outstanding objections to the presentence

17    report.  We're here for a sentencing in this case.

18              THE COURT:  All right.  Mr. Moses, good afternoon.

19              MR. MOSES:  Good afternoon, Judge.

20              THE COURT:  Have you had enough time to read over

21    the presentence report in this case and to discuss it

22    carefully with Mr. Bateman?

23              MR. MOSES:  I have.

24              THE COURT:  Now, I'm aware of a number of fairly

25    extensive objections that you made initially to the

presence report. I was informed last week that you wish to withdraw all those objections.

Is that correct?

*MR. MOSES:* That's correct, Judge.

*THE COURT:* All right. Mr. Bateman, let me speak to you, sir.

Have you had enough time to read over the presentence report in your case and to discuss it carefully with your attorney?

*THE DEFENDANT:* Yes, Your Honor.

*THE COURT:* You understand this is a very important document in terms of helping me decide upon a sentence in your case.

*THE DEFENDANT:* Yes, Your Honor.

*THE COURT:* Now, Mr. Moses just told me that he withdraws all of the objections he filed last week, which means that we would move forward on the presentence report as written.

Do you agree with your attorney's position in that matter?

*THE DEFENDANT:* Yes, Your Honor.

*THE COURT:* Very good. You can be seated then at this time.

*THE DEFENDANT:* Thank you.

*THE COURT:* With that, I will adopt the presentence

report as this Court's findings for purposes of guideline

sentencing in this case.  I'll also approve the plea

agreement that was reached earlier in this courtroom.

Having done so, it appears we're looking at the

following.  Under the applicable statute any sentence that I

impose cannot exceed 30 years.  Under the advisory guideline

provisions, the Total Offense Level is 28, the defendant's

Criminal History Category is one.  That gives us an advisory

sentence range of 78 to 97 months of incarceration.

Supervised release following incarceration will be two to

five years.  The fine was not calculated due to inability to

pay.  There's no restitution to be calculated here.  And

finally, the mandatory special assessment is $100.

So with that, I'd be glad to hear anything the

government wishes to say.

MR. MATTHEWS:  Your Honor, we don't have any

objections to the presentence report as it's written nor to

the guideline level calculations.  Your Honor, I'm happy to

argue the government's position regarding the 3553(a) factors

and potential sentencing range.

Mr. Moses indicated to me prior to today's hearing he

may have a motion for Your Honor prior to that point.

THE COURT:  All right.  Mr. Moses?

(Whereupon, an in camera hearing was held.  Courtroom

closed.)

1          (Courtroom opened.)

2              *THE COURT:*  All right.  We're back on the record

3     now.  I have denied the motion to go in camera, so we'll move

4     forward with public hearing from this point forward.

5          Mr. Matthews, I will be glad to hear you on your motion

6     for a downward departure.

7              *MR. MATTHEWS:*  Thank you, Your Honor.  May it

8     please the Court.  Last week my co-counsel, Mr. Holliday,

9     filed a motion for a downward departure pursuant to Section

10    5K1.1 of the United States Sentencing Commission Guidelines.

11         Your Honor, in this case there were two folks involved,

12    Mr. Thomas Allen Bateman, Junior, and Mr. Cody Lee Anderson.

13    Mr. Cody Lee Anderson has already tendered a guilty plea

14    before Your Honor; did so back last month.  Mr. Anderson --

15    sorry -- Mr. Bateman tendered his plea back in August.

16         Initially Mr. Bateman was indicted in this case.  After

17    subsequent to Mr. Bateman being indicted, Mr. Bateman came

18    forward to federal authorities, provided some information

19    regarding Mr. Cody Lee Anderson's role in this scheme and

20    artifice to defraud the named victim in this case.

21         After that occurred, the government filed a superseding

22    indictment in July of last year.  Your Honor, it's the

23    government's position that ultimately the information

24    provided by Mr. Bateman, specifically as detailed in

25    paragraph 48 of the presentence report, regarding the manner

and means and the steps undertaken, thought process between

Mr. Bateman and Mr. Anderson regarding adoption of this

scheme, ultimately with Mr. Anderson being the architect of

this scheme, ultimately not only led to Mr. Anderson's

indictment on a superseding indictment but also I think

influenced or certainly assisted the government in obtaining

a guilty plea from Mr. Anderson to Count One of this

Indictment, which is the same count Mr. Bateman pled to.

Your Honor, I'll specifically say of note to the

government was the quid pro quo that was reached between

Mr. Bateman and Mr. Anderson regarding potential pay-off of

Mr. Anderson's mortgage.

THE COURT: And how much was that going to be for?

MR. MATTHEWS: That's -- honest, Your Honor, to be

candid with the Court, we don't have the specific amount of

that. That specific amount was never discussed. It was, if

this works out, I will pay off the mortgage on your home.

That never--

THE COURT: Bateman was going to pay off

Mr. Anderson's home mortgage in part with money he got in

this -- from this--

MR. MATTHEWS: That's correct. Your Honor, but

specifically, information that was not known to the

government was regarding the date of the signing of the will.

The will was dated May 1st, 2020. For a number of reasons

the government thought that could not be correct. Had we gone to trial, witnesses would have testified to say May 1st, 2020 is not correct date.

Mr. Bateman provided information to indicate the actual signing of the date was -- well, which corresponds with other testimony the government would have put forward and information we received -- is actually in the spring of 2021.

Your Honor, when we wrote the indictment, we alleged on or about the date Mr. Bateman became power of attorney for this young lady in June of 2019 stretching all the way till April of 2022 when the will was withdrawn from probate. So we did not allege a specific offense date, but certainly that information was important to the government, would have assisted and aided the government had this matter gone to trial.

Your Honor, regarding a sentence here--

*THE COURT:* Let me jump in and ask this. Back when I practiced law a long time ago it took three witnesses to a will. Then we adopted the uniform probate court code which took it down to two.

So do those two witnesses in this case accede to a improper date as well? Put --

*MR. MATTHEWS:* Your Honor, the--

*THE COURT:* -- their name on as witnesses with an improper date filled in?

1          *MR. MATTHEWS:*  There were three witnesses.  There

2    was Erin Franklin, Kenna Housman, and -- might be getting the

3    names wrong -- Lauren Conner.  It's in the presentence

4    report.  I'll get the names exactly right.  Lauren Housman,

5    Kenna Conner and Erin Franklin, Your Honor.  And they

6    witnessed the will, although they said they did not know what

7    they were witnessing.  They saw an elderly woman sign a

8    document.  They were not sure what document they were

9    witnessing they signed.

10         Having said that, Your Honor, I don't practice in

11   probate court.  We have three folks in back that do.  It's my

12   understanding that part of the failure of the attempted

13   probate of this will was that it was not properly witnessed

14   and attested to.  But I -- beyond that, Your Honor, I

15   don't -- I can't say whether it would have fulfilled the

16   requirements of South Carolina law for attesting to the

17   probate of a will, but--

18          *THE COURT:*  This is one of those do-it-yourself

19   wills you get off the internet, right?

20          *MR. MATTHEWS:*  Yes.  Yes, it was.  It very much was

21   printed off the internet.  Had we gone to trial, the

22   government anticipates we would have called some of the folks

23   in the back, if not other attorneys that are more familiar

24   with the probate arena, to testify that the 2020 will lacked

25   some indicia of reliability to be -- appear as if it wasn't

1   drafted by an attorney.  So more or less, yes, Your Honor.

2       With all that being said, Your Honor, we didn't request

3   a specific level reduction here.  I think considering the

4   unique nature of this case, considering that it was an

5   intended loss versus an actual loss that Mr. Anderson--

6           THE COURT:  That's what's driving the sentence in

7   this case is the intended loss of $20 million.

8           MR. MATTHEWS:  Yes, that's correct.

9           THE COURT:  And the guidelines treat an intended

10  loss the same thing as an actual loss.

11          MR. MATTHEWS:  That's correct, Your Honor.

12          THE COURT:  And here there was no actual loss at

13  all to the family.  The will was not probated and the family

14  presumably got all the estate, right?

15          MR. MATTHEWS:  Well, it didn't necessarily go to

16  family.  There were a bunch of charities and individual

17  folks --

18          THE COURT:  Right.

19          MR. MATTHEWS:  -- that this young lady left her

20  assets to.  So it was -- her original will executed in 2001

21  was left to a variety of parties, but they eventually -- now,

22  of course, there were some legal fees involved, and we're not

23  seeking that as part of restitution, but ultimately the will

24  was probated; the 2001 will as intended.

25      So as Your Honor mentioned, the loss amount here of

approximately $20 million really drives the guidelines.
Mr. Bateman, he was held accountable for vulnerable adult
enhancement and for a being in a position of trust, a
fiduciary. And he should be held accountable for that, Your
Honor.

But there also is I think worth mentioning and in
evaluating 3553(a) factors that in the government's view
Mr. Bateman was not the architect of this scheme. That was
his co-defendant, Mr. Anderson.

THE COURT: Let me just say, you know, I'm from
that area of South Carolina, but I am no relation to the
defendant Anderson. I checked to make sure.

MR. MATTHEWS: Yes, Your Honor. And you mentioned
that at his change of plea hearing as well.

All those things being considered, Your Honor, it's a
unique nature and circumstances to consider under 3553(a);
Mr. Bateman's role, his culpability in it. We ask for a
specific--

THE COURT: Well, Mr. Anderson was a architect of
it, but Mr. Bateman was going to be primary beneficiary.

MR. MATTHEWS: Yes. That's true, Your Honor. And
so that -- that kind of weighs on the other side of the
ledger. As I get to what the government's recommended
sentence is, rather than recommend a specific level
reduction -- as Your Honor's laid out, he's looking at a

1    criminal history category -- or sorry -- offense level 28,

2    criminal history category one.  That's 78 to 97 months.

3        Your Honor, all -- evaluating all of these 3553(a)

4    factors, the need for a deterrent effect, the nature and

5    circumstances of the offense, fact he didn't actually get

6    this money, this scheme was not successful, the government

7    feels a sentence of 24 months would be sufficient but not

8    greater than necessary to meet the ends of justice.

9        Your Honor, that's kind of for the reasons I've laid out

10   thus far.  Also, it's probably a fools errand to attempt to

11   predict or prognosticate what Mr. Anderson's presentence

12   report would be.  Having said that, we anticipate his

13   guidelines would be slightly higher than that and therefore,

14   in light of the information Mr. Bateman provided to the

15   government and attempting to reward for -- him for that, the

16   government is recommending a sentence that would be lower

17   than what we anticipate Mr. Anderson's sentence would be.

18       We anticipate Mr. Anderson to be in the neighborhood of

19   30 months.  Therefore, Mr. Bateman being sentenced, with all

20   of the considerations I have outlined here today, I think a

21   sentence of 24 months would be an appropriate sentence here.

22       We ask Your Honor to consider that not so much as a

23   specific level reduction from the guidelines that are

24   already -- have been agreed to by both parties, but as a

25   sentence that would appropriately address the 3553(a) factors

1    and be sufficient but not greater than necessary to meet the

2    ends of justice regarding Mr. Bateman's role in this scheme.

3    That's the presentation from the government.

4            *THE COURT:* All right. Let me -- I walked out here

5    last week and got my guidelines manual and took it back to my

6    office and did not return it. So how much of a departure

7    will we have to go down to get to 24 months? How many

8    levels?

9            *MR. MATTHEWS:* Your Honor, it would be

10   approximately 12 levels. He's criminal -- sorry -- offense

11   level 28. That's 78 to 97 months.

12       If Your Honor were to depart down to level 16, Criminal

13   History Category one, that would be in the middle of the

14   guideline range, 21 to 27 months. 24 would be in the middle

15   of that.

16           *THE COURT:* All right. That's a substantial

17   departure.

18           *MR. MATTHEWS:* It is, Your Honor, and that's why --

19   Your Honor has a difficult job here, as you do with all

20   criminal sentencings, but in evaluating these factors and the

21   fact that although Mr. Bateman certainly did something that

22   was an awful thing to do, taking advantage of an elderly lady

23   who did not have the mental capacity to understand what she

24   was doing with her assets, ultimately, as I'm sure Mr. Moses

25   will emphasize, he was unsuccessful.

1     The intended loss is certainly great, and that drives

2   the guidelines up.  I also mentioned that Mr. Bateman doesn't

3   have a criminal history.  He wasn't given credit for the

4   zero-point offender.

5          *THE COURT:*  He has no criminal history, so he had

6   Criminal History Category one.

7          *MR. MATTHEWS:*  Yes, that's correct.

8          *THE COURT:*  Some people who have some minor

9   discretion with the law still at one, so--

10          *MR. MATTHEWS:*  Well, he didn't get the two level

11   zero-point offender reduction because of the vulnerable adult

12   enhancement.

13          *THE COURT:*  All right.

14          *MR. MATTHEWS:*  The guidelines -- I can't cite to

15   the exact section -- but they say if you have that

16   enhancement, you don't get the zero-point offender.  So I

17   think taking into account Mr. Bateman's lack of criminal

18   history, ultimately his non-leadership role, the fact the

19   scheme wasn't successful, I think all of those factors weigh

20   in his favor, and the assistance he provided to the

21   government ultimately led the government to the conclusion

22   that 24 months will be a just sentence.

23          *THE COURT:*  You know, these do-it-yourself wills, I

24   wish they could be outlawed.  I know several instances where

25   there were no fraud involved, but they were not admitted in

1    probate because they weren't done properly.  And if this

2    case -- if this thing had involved going to a real lawyer's

3    office, do a real will, this might not have happened.

4           MR. MATTHEWS:  Your Honor, I suppose that's true.

5    And that's ultimately an argument the government would have

6    made at trial in evaluating the quality of the 2020 will or

7    lack thereof I think we would argue indicated its fraudulent

8    nature.

9           THE COURT:  All right.

10        All right.  Mr. Moses, I'll be glad to hear from you.

11   You want to chime in on the downward departure motion first?

12          MR. MOSES:  Sure, Judge.  Thank you.  Judge, I --

13   obviously we have discussed with the government substantial

14   information throughout the past year or so dealing with this,

15   so, you know, part of the reasons, you know -- the

16   government's already mentioned the vulnerable victim

17   enhancement, the lack of getting the zero-point offender

18   reduction, and then the abuse of position of trust

19   enhancement.  That's four just for the two enhancements, and

20   he's losing two, so that's really a six, six-point swing.

21        We withdrew our objections, you know, after speaking

22   with the government, you know, thinking that we might be able

23   to reach the level of months that they are recommending, the

24   24 months.  The objections that we had to any of the other

25   things were really inconsequential.

1          So we are not here to try to object to those

2     enhancements.  We're here asking the Court to go along with

3     the recommendation of the government.

4          Mr. Bateman, he's 50 years old.  He's worked hard his

5     whole--

6               THE COURT:  Before we get to sentencing, let's just

7     talk about the departure first.

8               MR. MOSES:  Yes, sir.

9               THE COURT:  Twelve levels is a lot of departure.

10              MR. MOSES:  It is.

11              THE COURT:  I mean, and I have had cases where we

12    had violent criminals and violent drug dealers who cooperated

13    and subjected themselves to risk of harm to life and limb and

14    threats to their family and so forth, sometimes actual

15    physical harm, and I've not gone down that much.

16         But this case is somewhat unique.  But do you want to

17    try to convince me to go down any further on the downward

18    departure?  I'll hear you on your variance motion in just a

19    minute.

20              MR. MOSES:  Judge, I think that the sentence that

21    they have recommended definitely imposes a sentence that's

22    sufficient but not greater than necessary.  I think when you

23    take the nature and circumstances of the offense, the history

24    of Mr. Bateman--

25              THE COURT:  Well, before we get there, let me --

1    I'm going to grant the government's motion and depart

2    downward 12 levels from an offense level 26 to an offense

3    level 16.  That gives us a new guideline sentencing range of

4    21 to 27 months.  And absent a variance, I intend to impose a

5    sentence within that.

6         Now, back to government.  Anything on sentencing

7    generally?  Or do you stick with your recommendation of 24

8    months?

9              *MR. MATTHEWS:*  Your Honor, we'll just reiterate our

10   previous arguments regarding a sentence in the middle of that

11   guideline range I think would be appropriate I think for

12   three primary factors.  One, information Mr. Bateman

13   provided.  Two, his lack of leadership in this scheme.  And

14   then three, ultimately the fact it was not successful.

15        Certainly, Your Honor, I think would correctly say that

16   typically the government doesn't argue, well, just because it

17   wasn't successful doesn't mean -- well, certainly it's still

18   a crime and that's why we indicted him.

19        Having said that, it's a unique factual scenario because

20   the guidelines account for loss, even intended loss, intended

21   loss and actual loss.  The Fourth Circuit's recently ruled on

22   that saying that the act -- actual loss and intended loss are

23   the same thing.

24        But when you deal with a large amount like this, we're

25   talking about hypothetical dollars gained that weren't

1   actually gained, I think certainly Mr. Bateman should be

2   accountable for that, but maybe be given a break based on the

3   fact the gains were not realized.

4           THE COURT:  Right.

5           MR. MATTHEWS:  And so that's why we think a

6   sentence in the middle of the new guideline range, 24 months,

7   is appropriate in this case.

8           THE COURT:  All right.  Now Mr. Moses, you're

9   sitting on the guideline range of 21 to 27 months.  I'll be

10  glad to hear you on your motion for a variance to go down

11  below that.

12          MR. MOSES:  Thank you, Judge.  Mr. Bateman -- I'll

13  start with the 3553 factors, the nature and circumstances of

14  the offense, the need for the sentence imposed, and the kinds

15  of sentences available, Judge.

16      Mr. Bateman's 50 years of age.  He's got no prior record

17  like has already been mentioned.  He has been married for 17

18  years.  His wife Katie is here, his mom is here.  He's got

19  two children, Olivia, 15 years of age, and she's in the tenth

20  grade at Aiken -- South Aiken Baptist Christian, a son Chase,

21  who is nine years of age who is in the fourth grade at South

22  Aiken Christian.  He is very, very involved with his

23  children's lives.

24      He's got young children.  I'm the same -- we are the

25  same age and I have got young children, too, so I know how

1    important it is being involved with a child that age is like.

2    I coach my son's baseball team.  He coaches his son's

3    baseball team.  He is real involved, and he's a good dad and

4    he's a good husband and a good provider for his family.

5         He was working for a company called Dodge Company.  And

6    they sell embalming equipment.  He never owned a funeral

7    home.  He was a manager of a funeral home from 2012 to 2018,

8    and he left that to go into the sales business of selling

9    embalming fluid.

10        But he is the bread winner of his family.  And you know,

11   I wrote in my sentencing memo a couple of things, and it

12   might have surprised the Court.  I said he's humbled, he's

13   remorseful, he's ashamed, and then I put in there he is

14   relieved.  This is a relieving experience for him, believe it

15   or not.  It's a fearful experience, don't get me wrong, but

16   he's relieved that this is all put behind him.

17        When this happened back in 2001 -- or I mean 2021,

18   excuse me -- Cody Anderson was the owner of the funeral home

19   and he had developed a relationship with Mrs. Cranford [sic].

20   And she did all her pre-need stuff for her funeral

21   arrangements with Cody Anderson.  Cody Anderson knew all of

22   her assets.  Cody Anderson got all this information directly

23   from Cranford.

24        Cranford at one time, according to Bateman, he thought

25   she was lucid enough, and so did another attorney in Aiken,

1  thought she was lucid enough to appoint him power of

2  attorney.  And so they had been friends, they had developed a

3  friendship from 2012 til 2018, and she knew his family, knew

4  his kids, knew everybody.  He helped her run errands, he

5  helped pay for her groceries at the grocery store, helped

6  maintain her house in Aiken, helped do all those things for

7  her.

8       And as she declined in her physical mobility, she was

9  put into a nursing home.  And her mental capacity, according

10 to extensive medical records that the government has provided

11 us in retrospect to what he knew about at the time, she --

12 her mental capacity had diminished to the point where they

13 didn't feel that she was able to enter into legal documents.

14      But I wanted to point that out; that there was a lawyer,

15 an independent lawyer in Aiken, who thought that she was

16 lucid when she met with him and filled -- drafted all the

17 power of attorney documents for him, and that's how he became

18 her power of attorney; just to help her with little things

19 around town.  It wasn't for major things.

20      And so, did he know that she had some assets?

21 Certainly.

22         THE COURT:  I was going to say, is there any

23 evidence that either of these two men knew the extent of her

24 estate, that it was that big?

25         MR. MOSES:  Well, that's what I'm getting at, and I

want to tread lightly on this and carefully on this. She had

a Bank of America bank account that had I think a million

dollars in it, and then she had another checking account that

had, you know, just a regular amount of money -- I don't

remember -- a couple, maybe a hundred thousand dollars,

something in that, for that she used for spending.

There was a Merrill Lynch account. And you would argue

or the government would argue that he had to know about it

because he is her power of attorney. But if he had any

fraudulent intentions with her, he could have easily just

written himself -- just converted stock to himself if that's

what he really wanted to do.

But we would argue that he didn't know the extent of her

assets and that -- and, you know, a million dollars is what

he might have known that she had. 20 million, certainly not.

But we're not here to -- that's why I want to tread lightly.

We're not here to not accept responsibility for the scheme.

The amount of what was in the scheme is debatable. And

that -- and of course the Court knows that that amount is

what drove us to this level up here. That 20 million is up

here. If this was a million dollars, we probably wouldn't be

even in federal court. I don't even know if the federal

government would have been interested. And had they been

interested, the level would have been down here, we could be

looking at a probationary sentence most likely.

1      So, that is the whole driving factor of this case is the

2   value of her assets; that she had significant assets.  And so

3   when I say he's relieved, he had a friendship with this lady,

4   a 10-year friendship, and they were very close with his

5   family, his children.

6      And so two years ago when this scheme got foiled, he was

7   relieved.  In fact, when Cody was pushing this thing, Cody

8   got -- his co-defendant, Cody Anderson, was the one that got

9   her to sign it, the one that drafted it, the one that did the

10  whole thing.  And then afterwards, for a year Cody kept on --

11  kept dominion and control of that will and Bateman never even

12  saw it again.

13     Bateman at times was like, Cody, I don't want to go

14  through with this, let's not do this.  But that was it.  He

15  didn't go to law enforcement.  He didn't go try to rip it up.

16  He didn't do the things that he should have done looking back

17  on had he been stronger and smarter he would have done.

18     So he's not here to say that he's not part of this.  He

19  is part of this.  He knew what happened.  He wished it had

20  not happened.  He is relieved that it didn't happen.  And

21  then two years go by before he's even -- he thought it was

22  done.

23     And because it never went through, he thought this was

24  over.  And then he gets charged with this and, of course, the

25  fear comes back, oh my gosh, I have been charged.  But also,

1    strangely, another level of relief came over him because he

2    knew that this was going to have some finality and he's able

3    to face his wife, he's able to face his family, and face his

4    community and let them know the truth.

5        And that's what he's done from the very beginning since

6    the day he was charged.  He has let everybody know the truth

7    of what happened.  And he has fully cooperated with the

8    government, he's fully cooperated with this investigation.

9        And it wasn't self-serving.  It was just simply plain

10   the truth and getting it off of his chest.  And he got it off

11   his chest.  He went and spoke with the government.  He told

12   them exactly what happened, how it happened, when it

13   happened, who was involved.  He's been -- he's been talking

14   to the government since day one to get this off his chest.

15   He is relieved that this is over.

16       Is he scared?  Of course.  He's very fearful of what is

17   about -- what is about to come from the bench.  Does he want

18   to go to prison?  No, he doesn't want to go to prison, but he

19   is here knowing that that's a very, very distinct possibility

20   that he's going to go to prison.

21       He has never been in trouble before.  You -- I have got

22   some characters letters that have been submitted with my

23   sentencing memorandum.

24            THE COURT:  I've reviewed all those letters.  They

25   are in the record.

1          *MR. MOSES:*  And I just want to point out that some

2    of those letters are extremely powerful in my opinion,

3    talking about his character and how he's been a community --

4    involved in his community and he -- one of his hobbies is

5    cooking, and cooking briskets and barbecue and other things.

6    And he doesn't sell it.  He just gives it away.  He gives it

7    to the community, gives it to different charitable

8    organizations in Aiken.  And he's known for that in the

9    community.

10        People in the -- I have got a Vice Chairman of the Aiken

11   County Council talking about it in one of the letters talking

12   about his character, talking about their friendship, talking

13   about how good, honest and person of integrity that he is.

14        Now, we are here based on some decisions that he made or

15   a decision that he made that does not speak to that same

16   integrity, and that was a bad situation that he got in.  But

17   that does not speak to who this person is.  And his entire

18   life and his entire involvement in his community does speak

19   to his -- the person that he is, and the character letters

20   that I have sent.

21        Judge, I do -- in the PSR you'll notice that he has

22   struggled with some alcohol abuse.  And I would ask that he

23   be screened for the RDAP program.  If he is admitted to the

24   RDAP program, we know that with the guidelines the way they

25   are, we're tight on time to get through that.

1      With those things being said, Judge, if the Court sees

2   it that the nature and circumstances of the offense and the

3   history and the characteristics of the defendant and the need

4   for this sentence to be imposed and the kinds of sentences

5   available, I would think that this sentence is certainly

6   sufficient, not greater than necessary, but I also would say

7   that there's other options out there that would meet the

8   needs for sentencing in this case which would help him

9   continue to keep his family on their feet, provide for his

10  family, and get the substance abuse counseling that he is

11  seeking.

12      There is a counselor who wrote a letter on his behalf

13  saying that they would be willing to take over his case and

14  counsel him and give him substance abuse care if he were not

15  to be in prison.  And she also went further to say that she'd

16  be on the front steps at the gate when he got out of prison

17  to help him.

18      His family's really the loser in this case.  They have

19  already had to put their house up for sale.  I think his

20  wife's going to move in with her mother with the children

21  until this is all sorted out and he can come back home and

22  they can be a double-income family again.  But they've lived

23  in that house for quite some time.

24      This -- his son especially, the nine-year-old, is the

25  loser in this case losing his dad, losing him for a period of

1   time.

2          But Judge, I think the kinds of sentences available, the

3   need for the sentence imposed is certainly accomplished here.

4   This has been very public.  The community knows about it.

5   He's not going to be in a position of where he is in charge

6   of anybody's assets.  So the need to avoid or the need for

7   this sentence is met.  The public is protected.

8          He's going to have consequences for his admitted

9   actions, Judge.  But we'd also like for him to have the

10  opportunity to come home soon if not now on probationary

11  sentence.

12         And I know that if you're looking at the totality of

13  this, there's already come down a huge jump, and so I'm

14  cautious about even bringing that up to the Court because I

15  know that that's a big jump, and we're very grateful to the

16  government and the cooperation that Mr. Bateman has given

17  them and that -- them recognizing the cooperation.

18         But we do think that the needs for the sentence would be

19  met whether it's a probationary sentence or some lighter

20  sentence, Judge.

21             *THE COURT:*  Let me ask this.  One thing that's

22  always important to me in these nonviolent property crimes is

23  the degree of planning and execution.  Was it a one-time

24  momentarily lapse of judgment or did it occur over a period

25  of time?

1    And so, this is not a situation where these two

2    defendants woke up one morning and said let's go get this

3    elderly lady and change her will.  Had to at least involve

4    some degree of advanced planning.  I guess I should be asking

5    the government that.

6        Mr. Matthews, do you know the extent of the planning

7    that was necessary here?

8        *MR. MATTHEWS:*  Yes, Your Honor.  We would submit

9    there was planning involved here as it's laid out in the

10   presentence report.  Per Mr. Bateman's telling, Mrs. Crandall

11   did approach him about a -- getting a new will signed.  He

12   took her to attorney Morris Rudnick's office.  Did not sign a

13   will that day.

14       Then it was brought to -- basically Mr. Anderson

15   understood at that point, oh hey, this lady wants to get a

16   new will done, and then followed up with Mr. Bateman

17   repeatedly after that and then said, you know, provided him

18   with this internet will, for lack of a better word, then made

19   arrangements -- this was during Covid or at least in -- even

20   with the later date Mr. Bateman provided, this is spring of

21   2021, there were still Covid protocols at the nursing home

22   that this young lady was at at the time, so he had to make

23   arrangements to check her out of the nursing home.

24       They met outside in the carport.  There had to be

25   arrangements made to have witnesses available to sign this.

1    The date, May 1st, 2020 was given because it corresponded

2    with the date that she had come in to sign a pre-need sheet,

3    so that would reflect further planning.

4        I respect Mr. Moses making these arguments, but I think

5    the facts in the PSR contradict those.  And certainly if we

6    had gone to trial, the facts would have contradicted that

7    Mr. Bateman -- certainly we knew how much money she had, he

8    was the power of attorney, and if he wasn't -- I think he

9    would be a very poor power of attorney if he didn't know what

10   assets were available to this person to keep her needs met.

11       Furthermore, we would have presented witnesses at trial

12   stated that this woman sometimes bragged about her wealth,

13   said that she had considerable assets.  So I don't think that

14   is a very credible argument.

15       Then regarding -- certainly Mr. Moses made the argument

16   that he thought she was lucid.  We have -- it's detailed at

17   length in paragraph 38 of the presentence report regarding

18   her long history of mental illness dating back to 2013.  She

19   was involuntarily committed May of 2018, was ultimately

20   treated based on that and released.

21       She was evaluated again.  She was deemed to have

22   dementia in May of 2018 and deemed to have dementia again in

23   July of 2021 when Dr. Steiner re-examined her.  Additionally,

24   Your Honor, we would have presented evidence from a nurse

25   practitioner, Ms. Andrea Ellis, who saw this young lady on a

1  regular basis and would have testified that although not

2  being a psychiatrist like Dr. Steiner who -- also Dr. Steiner

3  would have opined regarding her ability to sign the will as

4  he does that as part of his practice; provides opinions on

5  people signing wills.  But Ms. Ellis would have testified

6  that you -- any person, layperson, speaking with the victim

7  in this case would know she wasn't quite right.

8       So I think all those things added together -- Your

9  Honor's certainly been very generous and granted the

10  government's motion for a 5K.  I think to go beyond that, as

11  Mr. Moses is asking for his variance would be a bridge too

12  far.

13       I think an incarceratory sentence is appropriate here.

14  If Your Honor keeps it as a level 16, that's in Zone D and

15  that is the appropriate sentence is an active incarceratory

16  sentence.  I think considering the considerable benefit

17  Mr. Bateman has gotten here thus far, I think to go down any

18  further would not be just and would be a bridge too far.

19            *THE COURT:*  All right.  Thank you.

20       Mr. Moses, go back to you now.

21            *MR. MOSES:*  Judge, I don't want to belabor the

22  issue any longer because we withdrew the objection to the

23  vulnerable victim.  But I do want to point out, since he

24  brought it up, that Dr. Steiner in all of these medical

25  records, which we -- we received in discovery.  We have no

1    access to that stuff prior to this charge.

2         But even in the PSR if you look at paragraph 38, Dr.

3    Steiner says Mrs. Crandall was not mentally ill but

4    experienced hallucinations, delusions and exhibit dangerous

5    behavior based on her lack of medication.  So when she's off

6    her medication, she would have experienced those things.  But

7    when she was on her medication, she was not mentally ill.

8    Then he says her remote memory was normal.  Then he goes on

9    further to say, Crandall's condition would ebb and flow from

10   day to day.

11        So, you know, I don't want to belabor that issue.  We're

12   not here to really argue that issue.  But from a credibility

13   standpoint I do want to just point that out because we're not

14   just blowing time with sky.  She was very lucid when he was

15   communicating with her the times that he -- he was given

16   tasks to run for her, to go to the grocery store, to go do

17   maintenance on her house or wherever the issue may be that

18   she was asking him to do.

19        And as far as being a power of attorney, I mean, I'm a

20   power of attorney myself for my parents or whoever.  But we

21   all know it doesn't mean that I just go -- I have carte

22   blanch capability to go start looking into their assets and

23   doing everything.  They are still alive and well and they do

24   that themselves.  Maybe I could, but I don't.  And maybe he

25   could, but he didn't.

1        And so I don't think that that's a real fair blanket

2    policy to state to the Court that he -- he absolutely knew

3    what her assets were just because he is power of attorney.

4    So that's where I was saying there's a lot of gray in what

5    his knowledge of her assets were, and but for that level of

6    her assets, we wouldn't even be here today.

7            THE COURT:  As her attorney in fact under the power

8    of attorney, did he not have access to her bank statements

9    and brokerage house statements that came in?  Or do we know?

10           MR. MOSES:  I'm sure he had access to it.  I don't

11   know to the extent that he actually dove that deep into her

12   personal assets.

13           THE COURT:  Right.

14           MR. MOSES:  He was more -- more kind of a

15   convenience for her through their friendship.  And keep in

16   mind they were friends from 2012 till this occurred in 2021.

17   So they -- it wasn't like this was just some random person

18   that he preyed on.  They had been -- they had developed a

19   very close friendship.

20           THE COURT:  All right.  Thank you, sir.

21       Now Mr. Bateman, you have the right under our rules of

22   procedure to make any statement that you wish at this time.

23   This is your chance to speak.  I will be glad to listen to

24   anything you want to say.

25       (Defense conferring.)

1          *THE DEFENDANT:*  Thank you, Your Honor.  First of

2     all, it's hard to get to speak in front of my family and

3     friends here and to admit my guilt.  The things that I have

4     done I'm not proud of.  I'm not happy with the way things

5     ended up.  I just wish things would have been differently.

6          I'm not here to make any excuses.  I'm accepting my

7     responsibility the actions that I took with the co-defendant.

8     I know I was wrong.  That's why I had every chance to meet

9     with Mr. Holliday and Mr. Matthews, I took that opportunity

10    and shared with them whatever information that I could.  And

11    I appreciate their kindness to me and treating me respectful

12    the way that they did.

13         This has humbled me very much, it's embarrassed me,

14    embarrassed my family, my friends, my livelihood, my

15    professional license in the funeral industry.  And again,

16    thank you for this opportunity to speak.  I just -- I don't

17    know.  Okay.  And it's just hard to stand up again, like as I

18    mentioned, but I appreciate everything and I just ask for

19    lenience and the best that you would be willing to give me.

20    And thank you for your time for listening through everything.

21         *THE COURT:*  Thank you, sir.

22         Anything further Mr. Moses?

23         *MRS. WEAVER:*  I'm his mother--

24         *MR. MOSES:*  Judge, I think his mother would like to

25    address the Court.

1          THE COURT:  She can come around.  If you'll state

2     your full name first, please.

3          MRS. WEAVER:  Good morning, Your Honor.  I

4     appreciate--

5          COURT REPORTER:  Please get to a microphone.

6          MRS. WEAVER:  Oh.  I'm Sharon Weaver, Allen's

7     mother, and I just pray that you show leniency on Allen for

8     the sake of his children and -- going through a hard time, we

9     all are.  And I know he's truly, truly sorry for what

10    happened.  Thank you.

11         THE COURT:  Thank you very much.

12         MR. MOSES:  Judge, you do have a letter from Aiken

13    County Council Vice Chairman Andrew Siders.  I just want to

14    point out he's not going to address the Court, but he is here

15    in support sitting in the back row.

16         THE COURT:  All right.  Thank you.  His presence is

17    noted.

18         MR. MOSES:  His letter speaks for itself.

19         THE COURT:  All right.  Anything further?

20      Any reply?  I think you've already replied, Mr.

21    Matthews.  Anything else to say?

22         MR. MATTHEWS:  I did, but I'll just address one

23    thing Mr. Moses said.  He pointed out that Dr. Steiner did

24    identify her as having up and down nature.  You know, some

25    days were better than others.  I don't know if that

1    necessarily weighs in Mr. Bateman's favor.

2         It's almost like playing a Russian roulette of when

3    you're going to get her to sign -- going to be a good day or

4    is it going to be a bad day?  Maybe we'll get lucky and get

5    her on a good day where she doesn't know what she's doing.  I

6    don't know.  It's -- I think it's regrettable either way, but

7    I don't think that necessarily weighs in Mr. Bateman's favor.

8         I think that should still be the overall assessment --

9    and if Mr. Bateman had known her since 2012, and he did, I

10   think he would have been privy to the extent of her mental

11   problems going back to 2013, and I think that weighs against

12   him in terms of understanding the mental condition there.

13        And I know Mr. Bateman -- Mr. Moses withdrew his

14   objection to the vulnerable adult enhancement, but I think

15   that evidence certainly supports that enhancement in this

16   case and we'll stick with our recommendation of a 24-month

17   sentence.

18             THE COURT:  All right.  I'm going to stick with

19   that as well and sentence at 24 months.  That's a -- over a

20   two-thirds reduction down from the low end of the otherwise

21   applicable guideline range.  And I -- Mr. Moses has done a

22   very capable job of advocating a variance to go down below

23   that, but I'm not persuaded.

24        I think that a guideline sentence under the new

25   guideline range, which is now 21 to 27 months, is the

1    appropriate sentence.

2         So with that, having calculated and considered the

3    Advisory Sentencing Guidelines and having also addressed the

4    Statutory Sentencing Factors of Section 3553(a) of Title 18,

5    it is the judgment of the Court that the defendant, Thomas

6    Allen Bateman, Junior, is hereby committed to the custody of

7    the Bureau of Prisons to be imprisoned for a term of 24

8    months.

9         I find the defendant does not have the ability to pay

10   the fine called for by the statute, therefore the fine is

11   waived.  He shall, however, pay the mandatory special

12   assessment of $100 due immediately.

13        Upon his release from incarceration, the defendant shall

14   be placed on supervised release for a term of three years.

15   While on supervised release status, the defendant shall

16   comply with the mandatory conditions of supervision outlined

17   in Title 18, Section 3583(d), and Guideline 5D1.3(a), and

18   also the standard discretionary conditions outlined in

19   Guideline 5D1.3(c), all of which is noted in paragraphs 88

20   and 91 of the presentence report.

21        My reasons for imposing these conditions are set out in

22   the presentence report and are also contained on a green

23   sheet of paper we placed on counsel table.  The Court of

24   Appeals has indicated that I must put on the record my

25   reasons.  And as a short-cut method of incorporating by

1  reference, I have referred to the presentence report and the

2  green sheet.

3       Mr. Moses, will you confirm on the record you and your

4  client have had access to those reasons?

5            *MR. MOSES:*  Yes, sir.

6            *THE COURT:*  All right.  Also the defendant shall

7  comply with the following special conditions.  Number one, he

8  must not incur new credit charges or open additional lines of

9  credit without the approval of the probation officer.

10      The second special condition is he must provide the

11  probation officer with access to any requested financial

12  information and authorize the release of financial

13  information including sharing it with the US Attorney's

14  Office.

15      My reason for imposing these two special conditions is

16  based on the nature of the offense of conviction here and

17  also to deter and detect potential future economic crimes and

18  to serve the statutory sentencing purposes of public

19  protection, deterrence, and rehabilitation.

20      Now, Mr. Bateman, you signed a plea agreement containing

21  your -- a partial waiver of your appeal rights in this case.

22  Only in very narrow circumstances may a defendant who has

23  waived his appeal in this fashion nevertheless attempt to

24  pursue an appeal.  You should discuss carefully with

25  Mr. Moses where you have -- whether you have any grounds for

1    appeal in this case and whether an appeal would be in your

2    best interest or not.

3         If you wish to appeal and could not afford an attorney,

4    the Court would appoint one for you.  If you wish to appeal,

5    you'd have to file notice of appeal within 14 days from the

6    day the Judgment Order containing your sentence is filed with

7    the Clerk in this court.

8         My reasons for imposing this sentence are as follows.

9    First I adopted the presentence report without objection,

10   which gave us a guideline sentencing range of 78 to 97

11   months.  Then I granted the government's motion for a

12   downward departure based upon the defendant's substantial

13   assistance to the government in the related case of United

14   States versus Anderson.

15        It was a significant departure, to be sure, from an

16   offense level 28 down to a level 16 with the new guideline

17   range of 21 to 27 months, but I'm persuaded that this is one

18   of those rare cases where the defendant's cooperation was a

19   substantial benefit to the government.

20        And I'm also somewhat persuaded by the fact that the

21   intended loss is a real severe penalty in guideline

22   sentencing.  I know that's the way it's supposed to be

23   calculated, but I think it -- to some extent it might

24   overstate the seriousness of the offense.

25        I considered the nature and circumstances of the

offense.  Here we have a defendant who pleaded guilty to

conspiracy to commit bank fraud, but the underlying crime was

enticing this elderly lady in her 80's with some mental

illness issues to change her will to leave everything to

Mr. Bateman, an estate of approximately $20 million; a

serious crime to be sure.

It was not consummated.  The will was not probated.  I

understand that fully.  But nevertheless, it was a scheme to

enrich one's self at the -- to the detriment of this elderly

lady and her beneficiaries under her earlier will.  It's a

serious crime.

As to the history and characteristics of the defendant,

as Mr. Moses pointed out Mr. Bateman has no criminal history

whatsoever.  He's been a law-abiding citizen all of his life.

He has an extremely good family.  He has good family support.

He has good community support including the Vice Chairman of

Aiken County Council, which carries some weight with me.

He does have some detail -- described alcohol abuse

problems, and I will recommend to the BOP that he be allowed

to participate in the LRADAC program if he otherwise

qualifies.

He's lived in the Aiken area for approximately 12 years.

He does have high blood pressure and psoriasis.  No history

of mental or emotional health issues.  He has a high school

diploma and a degree in mortuary science.  He's currently

1  unemployed and lacks the ability to pay a fine.

2      I have also considered, as required, the need for the

3  sentence imposed to reflect the seriousness of the offense.

4  I think a substantial sentence of 24 months is appropriate to

5  do that.  Also promote respect for the law and to provide

6  just punishment and adequate deterrence to the defendant and

7  others not to engage in such conduct, and to protect the

8  public from future crimes of the defendant, which I don't

9  think is much of a factor here.  I don't think Mr. Bateman is

10 going to reoffend any time soon.

11     I am convinced that he is sincerely remorseful for his

12 actions in this case, and his expressions of remorse I find

13 to be genuine and authentic, and that played a part in my

14 sentence.

15     As to the request for a variance, a further drop down in

16 the sentence below the departure level, I have carefully

17 considered all the arguments advanced in the written motion

18 by Mr. Moses and made here in court today.  Much of the

19 information is biographical, and I have already mentioned a

20 good bit of it.

21     But suffice to say, I considered those grounds, his

22 biographical information, his background, his family support,

23 his lack of a criminal involvement in the past and so forth,

24 but I am not convinced that they are sufficient to warrant a

25 variance from the guideline range.

1      I should have said this earlier.  I find that a sentence

2  of 24 months is sufficient but not greater than necessary to

3  serve the statutory sentences of -- purposes of sentencing

4  under the guidelines.

5      And as I said, all the -- all the statements in the

6  motion for a variance are mainly geared towards his lack of a

7  prior record, his family support, his community support, the

8  fact that he's very involved in his children's lives, and I

9  find no grounds for any additional variance.  And I have

10  carefully considered all the arguments that have been

11  advanced.

12      Do you want me to make a recommendation to place of

13  service of sentence, Mr. Moses?

14          MR. MOSES:  Judge, we'd ask that you recommend

15  Edgefield.

16          THE COURT:  All right.  Know right where that is.

17  It's just right up there close to Aiken.  I'll make that

18  recommendation.

19      And I'll recommend he be allowed to participate in

20  LRADAC program if he otherwise qualifies.

21          MR. MOSES:  Thank you, Judge.

22          THE COURT:  And what about voluntary surrender?

23  Any objection?

24          MR. MATTHEWS:  Your Honor, we don't have an

25  objection to that.

1          THE COURT:  All right.  Mr. Bateman, I'll let you

2     if you -- you can either go into custody today or, if you

3     wish, you may report on your own at your own expense to the

4     designated institution.  If you choose that option, you must

5     show up on time at the appropriate place.

6          You understand?

7          THE DEFENDANT:  Bond?

8          THE COURT:  You understand?

9          THE DEFENDANT:  Yes, Your Honor.

10          THE COURT:  All right.  Anything further?

11          MR. MATTHEWS:  Your Honor, pursuant to terms of our

12     plea agreement, at this time the government moves to dismiss

13     Counts Two and Three of the Superseding Indictment as to

14     Mr. Bateman.

15          THE COURT:  All right.  So ordered.  Thank you very

16     much.

17          THE CLERK:  And the original Indictment?

18          MR. MATTHEWS:  I suppose I need to do that, too.

19          THE COURT:  All right.  The original Indictment is

20     dismissed on motion of the government and the remaining

21     counts in the Superseding Indictment.

22          MR. MATTHEWS:  Thank you, Your Honor.

23          THE COURT:  Thank you very much.  We will be in

24     recess.

25          MR. MOSES:  Thank you, Judge.

1          (Hearing concluded.)

2                                    ***

3          I certify that the foregoing is a correct transcript

4     from the record of proceedings in the above-entitled matter.

5

6          s/Kathleen Richardson

7          _____          May 21, 2025

8          Kathleen Richardson, RMR, CRR

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25